UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
STEVEN MONTALDO,                           :
                                           :     10 Civ. 6163 (SHS)
                          Plaintiff(s),    :
                                           :     OPINION & ORDER
            -against-                      :
                                           :
MICHAEL J. ASTRUE,                         :
Commissioner of Social Security,           :
                                           :
                          Defendant.       :
-----------------------------------------------------------------x


SIDNEY H. STEIN, U.S. District Judge.

    Plaintiff Steven Montaldo brings this action to review the Commissioner of Social

Security's final decision denying him Supplemental Security Income and Disability

Insurance Benefits, pursuant to 42 U.S.C. § 405(g).  Both parties have moved for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Because

the Commissioner's determination was free of legal error and supported by substantial

evidence, the Court grants judgment on the pleadings in his favor.

## I.   BACKGROUND

### A.   Procedural history

    On January 10, 2007, Steven Montaldo applied for Supplemental Security Income

("SSI") and Disability Insurance Benefits ("DIB"), alleging that he was disabled.  (R. at

97, 101.)[1]   During his intake interview with the Social Security Administration ("SSA"),

Montaldo stated that his ability to work was limited by Alport's disease, constant

urination, hypertension, a heart condition, depression, gout, and fatigue.  (R. at 129-30.)

---

[1] "R. at _____" refers to the administrative record filed by the Commissioner of Social Security as part
of his Answer to the Complaint. (Dkt. No. 10-cv-6163.)

On March 26, 2007, the Social Security Administration denied Montaldo's applications. (R. at 57, 61.)

At Montaldo's request, Administrative Law Judge ("ALJ") Kenneth L. Scheer conducted a hearing on January 29, 2009, at which Montaldo was represented by counsel. (R. at 26.)  At the hearing Montaldo moved to limit his disability claim to an agreed upon "closed period" from December 22, 2006 until November 1, 2008, rather than pursue a claim for an ongoing disability.  (R. at 24, 28.)  On February 18, 2009, the ALJ issued a written finding that Montaldo was not disabled during the closed period.  (R. at 18, 25).

The Appeals Council denied Montaldo's request for review of the ALJ's decision on May 26, 2009, and the ALJ's decision became the final decision of the Commissioner of Social Security.  (R. at 10.)  The Appeals Council received additional evidence on September 16, 2009 and added it to the Record.  (R. at 5.)  The Appeals Council then set aside its May 26 decision in order to consider the new material. (R. at 2.)  After considering the additional evidence, it again denied Montaldo's request for review of the ALJ's decision.  (*Id.*)

Montaldo then filed this action. The parties have each moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Pursuant to 42 U.S.C. § 405(g), Montaldo seeks remand for further administrative proceedings.  The Commissioner asks that the district court affirm the decision to deny benefits and to dismiss plaintiff's complaint.

B.   Factual background

1.   *Non-medical history*

Montaldo is a fifty-seven year old high school graduate who attended some community college and vocational programs.  (R. at 39.)  He lived alone in an apartment in the Bronx during the period for which he sought disability.  (R. at 39, 97, 115.)

2

a.   Plaintiff's testimony

At the hearing, the ALJ questioned Montaldo about his employment history, including the periods before, during and after his claimed period of disability.  He also questioned Montaldo about his personal life, his physical health, his treatment for depression, and why he felt that he was disabled.

In regard to his employment history, Montaldo testified that he worked as a wine and spirits salesman for Charmer Industries, from 1980 to 1984 and from 1989 until February 2006; he worked for an importer during the interim.  (R. at 30-31.)  His employment ended when he was laid off following Charmer's consolidation with another company. He elaborated that he was terminated following a performance evaluation of the entire staff and not because of any physical or mental defects.  (R. at 32-33.)  Montaldo testified that he received unemployment benefits from approximately April 1, 2006 until September 2006.  (R. at 32.)  In response to questioning from the ALJ, Montaldo indicated that his period of disability started after his unemployment benefits had ended. (*Id.*)

Montaldo then described his efforts to work at three part-time jobs during his claimed period of disability.  He testified that between August 2006 and January 2007 he spent 300 hours training at a dog grooming school, in order to obtain his certification. (R. at 36-37.)  He said that he sometimes spent the entire day at the school.  (R. at 37.) Montaldo also testified that he worked part-time for a company called Testa Wines from May 2007 until December 2007.  (R. at 33.)  Montaldo worked on commission and earned $4900 during that time span.  (*Id.*)  He worked between 3.5 and 4.5 hours per day, two days a week.  (*Id.*)  Montaldo stated that he left this position with Testa because it provided him with "insufficient income."  (R. at 34.)  Montaldo testified that after selling wines for Testa, he got a license from the Taxi and Limousine Commission.  (*Id.*)  In the "Work History Report" that Montaldo submitted to the SSA, he indicated that he worked

as a taxi driver 12 hours per day, two days per week from August 2008 through September 2008.  (R. at 161, 164.)

Montaldo also addressed his then-current work as a salesperson for Cablevision.  (R. at 35-36.)  He testified that he would go to the homes of former customers to try and sell them new services.  (R. at 36.)  Montaldo also testified that he was earning a salary of $40,000 per year plus commissions and bonuses.  (*Id.*)

The ALJ also questioned Montaldo about his psychiatric care and his depression. Montaldo testified that he initially entered therapy in September 2005 when he went to St. Vincent's for daily individual and group therapy.  (R. at 40.)  Montaldo also testified that he received treatment from therapists at Sound View Community Mental Health Center on a bi-monthly basis because of his depression.  (*Id.*)  Montaldo denied ever trying to hurt himself or others, and he testified that he had his brothers as a support system during his separation from his wife.  (*Id.*)

In response to questioning from the ALJ, Montaldo stated that the reason why he felt disabled was his use of the antidepressants Cymbalta and Zoloft.  (R. at 41-42.)  He testified that he took Cymbalta for no more than a week and that his psychiatrist told him "to immediately stop taking it," when he reported that it made him feel suicidal.[2]  (R. at 42.)   Montaldo also testified that he later tried Zoloft, but that he had a "wors[e] experience" than with Cymbalta.  (R. at 43.)  He further testified that another antidepressant, Lexapro, did not help with his depression.  (R. at  42.)

Montaldo testified that he distrusted the psychiatric procedure, and that it did not work for him.  (R. at 43.)  He recalled that he had five therapists and that they "play[ed] guessing games" trying to help him. (*Id.*)  He explained that he got to the point where he felt that he needed to fix his problems on his own.  (R. at 44.)

---

[2] Montaldo estimated that he took Cymbalta in "late 2007" (R. at 42), but his medication history indicates that he was prescribed Cymbalta on June 9, 2006 and that he discontinued using it on July 13, 2006 (R. at 415).

In addition, the ALJ questioned Montaldo about his physical health and Alport's disease.  Montaldo described Alport's disease as a sex-linked genetic disease.  (R. at 41.) He explained that it gave him nausea, vomiting, motion sickness, gout, and urinary tract infections.  (*Id.*)  He also said that he was told that he would be on dialysis by the time he was fifty-five, and that his mother and uncle died "from dialysis" in their fifties.  (R. at 44.)

### b.   Vocational expert testimony

Annie Leopold, a vocational expert, testified at the hearing and classified Montaldo's past full and part-time work at the hearing using the Dictionary of Occupational Titles.[3] (R. at 47.)  She testified that the classification code for his work as a taxi driver was 913.463-018, and that it was medium work with an SVP of "3 lower semi-skilled."[4]  (*Id.*) The classification code for his position selling wine was 260.357-018, "sales representative wine and spirits," and she described it as light work with an SVP of "4 lower semi-skilled."  (*Id.*)  She also classified his then current work for Cablevision as 259.357-022, "sales representative," and described it as light work with an SVP of "3 lower semi-skilled."  (R. at 48.)

### 2.   *Medical history*

#### a.   Mental health

##### i.   Treating physicians

Montaldo began treatment at the Sound View Throgs-Neck Community Mental Health Center on March 6, 2006.  (R. at 318.)  He was referred to Sound View after visiting the emergency room of Jacobi Hospital to get medication.  (R. at 318, 338.)

---

[3] U.S. Dep't. of Labor, Dictionary of Occupational Titles (4th ed. rev. 1991), *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTMESS.HTM.
[4] "SVP" refers to the time required by a typical worker to develop average performance in a particular work situation.  *Id.* at App'x C.  An SVP of 3 requires a period of one to three months.  An SVP of 4 requires a period of three to six months.  *See id.*

Montaldo was initially interviewed by Jessica Kemp, LMSW, and he stated that his chief complaints were that he had lost his job and was getting divorced from his wife of 25 years.  (R. at 338.)  Kemp observed that Montaldo had a depressed mood, grief, anxiousness, weight loss, and anger.  She noted that Montaldo had a family history of post-traumatic stress disorder, depression, and anxiety.  (R. at 341.)

On April 27, 2006, Dr. Koppes, M.D., conducted a psychiatric evaluation of Montaldo.  (R. at 208-13).  Montaldo reported that he had become depressed during the course of his marital breakup.  He also reported that he was in a 2 week program at St. Vincent's Hospital in August 2005, and that he had been treated with Lexapro, Ambien, and Klonopin.  (R. at 208, 210.)  Montaldo reported taking these medications until February 2006, and then weaning himself off them over the course of a month.  (R. at 208.)  Montaldo denied having suicidal or homicidal ideation (R. at 208, 212) but Dr. Koppes reported that he had had "vague suicidal ideation" in August 2005 with no attempts at suicide (R. at 210).  Montaldo also reported having a depressive episode eight years earlier.  (R. at 213.)  Dr. Koppes observed Montaldo as having a "well-groomed" appearance; a "cooperative" attitude; normal behavior and speech; a "logical and organized" thought process; "no delusions;" no audio or visual hallucinations; a "eurythmic mood;" and "intact" impulse control.  (R. at 211.)  Dr. Koppes also described Montaldo as being alert, with "good" attention, recent and remote memory, ability to abstract and generalize, and as having "average" intelligence with "fair" insight and judgment.  (R. at 212.)  Dr. Koppes diagnosed Montaldo with recurrent and severe major depressive disorder (without psychotic features).  (R. at 213.)  He ruled out bipolar disorder and diagnosed Montaldo with hypertension and a GAF of 60.[5]  (R. at 213.)

---

[5] "GAF" refers to the Global Assessment of Functioning.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Am. Psych. Assoc. ed., 4th ed. 2000).  It is a single measure scale that is used to track a person's psychological, social, and occupational functioning.  *Id.*  A score between 71 and 80, inclusive, indicates that any symptoms "are transient and expectable reactions to psychological stressors," and that there are "no more than slight impairments in social, occupational, or school functioning . . . ." *Id.*  A score between 61 and 70, inclusive, indicates "[s]ome mild symptoms . . . or some difficulty in social,

On May 10, 2006, Kemp and Dr. Koppes completed a comprehensive treatment plan for Montaldo.  (R. at 214-16.)  They noted that Montaldo's principal diagnosis was unspecified depressive disorder, and that he had also been diagnosed with high cholesterol and gout.  (R. at 214.)  They also noted that his psychological stressors were his recent divorce, recent unemployment, and the welfare of his children.  (*Id.*)  They noted that his current GAF score was 70, and that his score over the past year had been 60.  (*Id.*)  Dr. Koppes and Kemp indicated that Montaldo had "good interpersonal skills," a "significant support system," the "ability to travel independently," the "ability to live independently," "good cognitive function," "good" physical condition, "insight into [his] problems," and significant education and work histories.  (*Id.*)  They identified his goals for treatment as 1) effectively coping with and reducing his depressive symptoms; and 2) reducing the "symptoms brought on by psychological stressors."  (R. at 215.)

Montaldo's treatment plan was next reviewed by Kemp and Dr. Koppes on August 10, 2006.  (R. at 219-20.)  Dr. Koppes and Kemp indicated that his GAF score was 65.  (R. at 219.)  They also described Montaldo's progress towards his two therapy goals.  Montaldo attended and was engaged in weekly psychotherapy sessions; reported compliance with his medication; and would "consistently work[] through issues relevant to his depression . . . ."  (R. at 220.)  He also "reported reduced feelings of anger" and an "increased ability to control reacting impulsively."  (*Id.*)

The Record also includes Kemp's notes for Montaldo's weekly therapy sessions from September 14, 2006 until January 11, 2007.  (R. at 234-50.)  During this period Kemp noted less depression (R. at 238, 245, 249, 250) improved anger management (R. at 237, 239, 249) continued excitement about a dog grooming career (R. at 246), and enthusiasm

---

occupational or school functioning . . . but generally functioning pretty well . . . ." *Id.*  A score between 51 and 60, inclusive, indicates "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . ." *Id.*  A score between 41 and 50, inclusive, indicates "[s]erious symptoms or any serious impairment in social, occupational, or school functioning . . . ." *Id.*

about dating (R. at 245, 247).  Montaldo also reported improved relations with his soon to be ex-wife and strong relations with his children.  (R. at 250.)

On January 4, 2007, however, Kemp reported "increased depression."  (R. at 236.) She also reported that Montaldo was concerned about what his children's impression of him would be if he were on disability.  (*Id.*)  One week later, Montaldo had his last session with Kemp (R. at 235) before starting therapy with Bob Keeler, LMSW (R. at 234).  At his last session with Kemp, Montaldo asserted that he was going to continue psychotherapy.  (R. at 235.)

On January 25, 2007, Montaldo began working with Bob Keeler.  (R. at 234.)  They discussed his transition to a new therapist, his "history and symptomology," his goals, and his desire to continue psychotherapy.  (*Id.*)  Montaldo also stated that unemployment was "difficult for him"; that he had completed his training to become a dog groomer; and that he was struggling to decide whether to accept a job offer from a wine distributor. (*Id.*)  At this meeting, Montaldo reported feeling depressed, but Keeler observed that he was "well groomed, pleasant and cooperative."  (*Id.*)  Mr. Keeler also reported that Montaldo "sometimes thinks about dying," but denies having suicidal ideations.  (*Id.*)

On February 9, 2007, Dr. Koppes and Keeler completed a "Treatment Plan Review" for Montaldo.  (R. at 492-93.)  They indicated that Montaldo had reported improvement in his moods (R. at 492) and that he had voluntarily stopped taking his medications, although he recently felt like he needed them (R. at 492-93).  They noted that Montaldo reported improvement with his anger and impulsiveness, but felt that he had "a lot to work through."  (R. at 493.)  Koppes and Keeler indicated no change to his diagnosis and that his prognosis was good.  (R. at 492.)  They recorded a GAF score of 75.  (*Id.*)  They also completed a similar Treatment Plan Review on May 9, 2007 and indicated that his GAF score was again 75.  (*See* R. at 490-91.)

Montaldo had his last session with Keeler on May 17, 2007.  (R. at 306-08, 358-60.) Sound View terminated his care on August 2, 2007 because they had lost contact with

Montaldo.  (R. at 312, 364, 461.)  An additional termination form was also completed on September 17, 2007 because Sound View had not had client activity for at least ninety days.  (R. at 306, 358.)

Montaldo re-contacted Sound View, and on September 11, 2007, Keeler screened Montaldo for readmission.  (R. at 309.)  Keeler indicated that Montaldo had a diagnosis of major depressive disorder.  (*Id.*)  Mr. Keeler also recorded that Montaldo had a current GAF score of 75.  (R. at 502.)  Montaldo reported a lack of motivation and that he could not "get himself going."  (R. at 391.)  Montaldo also reported that he had found employment, but that he still had serious financial problems and needed to find a new place to stay.  (*Id.*)  Keeler reported Montaldo's psychosocial symptoms as "moderate." (R. at 502.)

On October 29, 2007, Dr. Aparna Pemmaraju completed a psychiatric evaluation of Montaldo.  (R. at 327-35, 380-385.)  Montaldo reported that he had a history of Alport's disease, early renal failure, and hypertension.  (R. at 328, 330, 381-82.)  Dr. Pemmaraju reported that Montaldo had a depressed mood (R. at 331, 383), but also fair insight and judgment (R. at 333, 384).  Montaldo was diagnosed with recurrent major depressive disorder and a GAF score of 50.  (R. at 334, 385.)

One month later, Anna Morales, LMSW, and Dr. Pemmaraju completed a "Comprehensive Treatment Plan" for Montaldo.  (R. at 386-90, 481-85.)  Montaldo's diagnoses were unspecified depressive disorder; high cholesterol and gout; with severe psychosocial stressors of "divorce proceedings/settlement" and unemployment; a current GAF score of 45; and a GAF score of 70 for the past year.  (R. at 386, 481.)  They noted that Montaldo had not experienced delusions, hallucinations, or either violent or suicidal behavior.  (R. at 386, 481.)  They also reported that Montaldo had "good interpersonal skills"; was "able to live independently"; had "good" work history, cognitive functioning, and physical condition; and was compliant with his treatment.  (R. at 386, 481.)

On February 8, 2008, Morales and Dr. Nicolas Davila Katz, M.D. completed a "Treatment Plan Review" for Montaldo.  (R. at 486-87.)  The noted that his diagnosis had not changed and that he had a GAF score of 45.  (R. at 486.)  They also noted that Montaldo had not met the discharge criteria and that he needed "ongoing cognitive therapy and medication therapy."  (*Id.*)  However, on May 1, 2008, Montaldo was terminated from Sound View's care because he had not been in contact for more than ninety days, his last date of service having been December 20, 2007.  (R. at 453.)

ii.     Consulting psychiatrists

Dr. Herb Meadow (R. at 268-71) and Dr. P. Kudler (R. at 276-89) served as consulting psychiatrists.  On February 20, 2007, Dr. Meadow reviewed Montaldo's medical and psychiatric history and performed a psychiatric evaluation.  (R. at 268.)  Dr. Meadow noted that Montaldo reported having difficulty falling asleep and that he described himself as "being depressed with increased irritability, low energy levels, and diminished self-esteem."  (*Id.*)  He also noted that Montaldo described "excessive apprehension and worry," but that he had no thoughts of suicide and no history of panic attacks, manic symptoms, thought disorders, or cognitive deficits.  (R. at 268-69.)  Montaldo reported that he could dress, bath, and groom himself.  (R. at 270.)  He also reported that he could cook, clean, do laundry, shop, manage money, and use public transportation.  (*Id.*)  Montaldo reported that he would socialize with friends and family, watch television, listen to music, and read when he was at home.  (*Id.*)

Dr. Meadow's observed that Montaldo's mood was "depressed," but that his "demeanor was cooperative" and his "manner of relating was adequate."  (R. at 269.)  He observed that Montaldo was "well-groomed" with a clear quality of voice, whose "[e]xpressive and receptive language was adequate."  (*Id.*)  Montaldo's thought processes were "coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting."  (*Id.*)  His affect was "appropriate in speech and

thought content." (*Id.*) His attention and concentration were intact for "counting, calculations, and serial 3s from 20." (*Id.*) His recent and remote memory skills were intact for "being able to repeat 3 out of 3 objects immediately and after five minutes," as well as "being able to repeat 4 numbers forward and backward." (R. at 269-70.) Montaldo's cognitive functioning was reported as being "average" with "fair to good" insight and judgment. (R. at 270.)

Dr. Meadow concluded that Montaldo had an "[a]djustment disorder with depressed mood. (*Id.*) He also concluded that Montaldo "would be able to perform all tasks necessary for vocational functioning. (*Id.*) Dr. Meadow reasoned that these conclusions were "consistent with [Montaldo's] psychiatric problems, but that they did "not appear to be significant enough to interfere with the [his] ability to function on a daily basis." (*Id.*) Dr. Meadow wrote that Montaldo's prognosis was fair, and that he should continue with psychiatric treatment." (*Id.*)

On March 16, 2007, Dr. Kudler completed a "Psychiatric Review Technique" and evaluated Montaldo's functional limitations. (R. at 276-89.) He determined that Montaldo suffered from depression (R. at 279), but that his impairments were not severe (R. at 276). He also concluded that Montaldo had no restriction of activities of daily living; no difficulty maintaining social functioning; no difficulty maintaining concentration, persistence or pace; and no "episodes of deterioration." (R. at 286.)

> b.   Physical health

>> i.   Treating physicians

Since 2003, Dr. Veronica Delaney, a nephrologist, has treated Montaldo's Alport's disease (R. at 505), seeing him every four to twelve weeks (R. at 406.) That condition has given Montaldo, chronic kidney disease, proteinuria, hypertension, sleep apnea, fatigue and some hearing loss. (R. at 505.) On December 17, 2008, Dr. Delaney reported that it will cause renal failure within two to ten years. (*Id.*) She also stated that he is

currently taking Norvasc, Hyzaar, and Allopurinol to control his blood pressure and his severe proteinuria.  (*Id.*)  She wrote that his primary symptom is fatigue, and that it "may be expected" from his kidney dysfunction and high level or proteinuria, "[a]lthough this degree of fatigue is unusual."  (*Id.*)

As part of Montaldo's disability evaluation, the SSA sent a questionnaire (the "SSA Questionnaire") to Dr. Delaney to evaluate his work-related functional capacity.  She returned the SSA Questionnaire on January 26, 2007 (R. at 272-75), approximately one month after she had last seen him (R. at 272).  Dr. Delaney indicated that he had been diagnosed with chronic kidney disease, Alport's disease, and hypertension.  (*Id.*)  She also wrote that his symptoms included tiredness.  (*Id.*)  She indicated that he was taking Lexapro, Allopurinol, Hyzaar, and Norvac.  (R. at 273.)  She also indicated that he did not have "any limitations of physical activity as demonstrated by fatigue, palpitation, dyspnea, or angina discomfort on ordinary physical activity."  (R at 274.)  She opined that his ability to lift or carry was limited to frequently lifting 25 pounds.  (*Id.*)  She also indicated that he could "stand and/or walk" for up to 2 hours per day (*id.*) and that he had no limitation sitting (R. at 275).  Dr.  Delaney further indicated that Montaldo's ability to push and pull were limited, but did not specify the type of limitation or its extent.  (*Id.*)  Finally, she noted that he had limited hearing, which she expected to worsen.  (*Id.*)

Four days later, on January 31, 2007, Dr. Delaney completed a second questionnaire at the request of Montaldo's attorney (the "Attorney Questionnaire"), regarding plaintiff's ability to do work-related activities.  (R. at 406-13.)  She reported a functional assessment that differed in various respects from the SSA Questionnaire, even though she had not evaluated Montaldo in the interim.  (*See* R. at 406.)  She indicated that Montaldo would be able to sit for eight hours per work day, "stand/walk" for three hours, frequently lift and carry "5-10 lbs," and that he would have no "significant limitations doing repetitive reaching, handling, fingering, or lifting."  (R. at 408-09.)  She summarized these limitations as "minimal" for using the upper extremities.  She also noted that his

symptoms would not "increase in a competitive work environment." (R. at 410.) She wrote that Montaldo's pain, fatigue, or other symptoms would periodically interfere with his attention and concentration. (R. at 411.) Also, his impairments would be ongoing with the expectation that they would "last for at least twelve months." (*Id.*) She further indicated that he would not have to take unscheduled breaks to rest during an eight hour work day. (*Id.*) She opined that his impairments would likely produce both good and bad days, but that he would have to miss work "less than once a month" due to these impairments or any treatments. (R. at 412.) She did not indicate any restrictions on Montaldo's ability to work because of "psychological limitations" or with pushing, pulling, kneeling, bending, or stooping. (*Id.*)

Notwithstanding these reports, Dr. Delaney informed the SSA and the ALJ by letter dated December 17, 2008, that she was "not qualified to assess Mr. Montaldo['s] functional capacity, or in a position to judge his occupational abilities." (R. at 505.) She went on to state that "I can only say that Mr. Montaldo has severe kidney disease, which is progressive, associated with nephritic range of proteinuria and can sometimes cause severe fatigue." (*Id.*)

After submitting the two questionnaires, Dr. Delaney, had follow up visits with Montaldo in March and November 2007, and July 2008. (R. at 297, 349-50, 436, 438-39.) Montaldo continued to have problems with fatigue (R. at 297, 349, 436, 438), hearing loss (R. at 297, 350, 439), hypertension, and proteinuria (R. at 349, 436-38). Dr. Delaney also reported diolipidimia in November 2007 (R. at 349, 438) and both a heart murmur and fatigue in July 2008 (R. at 436-37).

ii.   Consultative evaluations

Dr. Sharon Revan and L. Donatelli performed consultative evaluations of Montaldo's functional capacity. On February 27, 2007, Dr. Revan performed a consultative "Internal Medical Examination" on Montaldo (R. at 263) and took his medical history (R. at 264-

265).  She diagnosed Montaldo with hypertension, gout, Barrett's esophagus, Alport's disease, and a heart murmur.  (R. at 266.)  She observed that he had no motor or sensory deficits.  (R. at 265.)  She reported that he could cook, clean, do laundry and shop with no difficulties and that he could shower and dress without help.  (R. at 264.)  She also reported that he watched TV, read, listened to the radio, socialized, and followed up with his doctors.  (*Id.*)

Dr. Revan also performed a clinical analysis of Montaldo's physical capabilities. She observed that Montaldo was not in acute distress, had a normal gait and stance, could walk on his heels and toes without difficulty, could fully squat, and that he did not use assistive devices.  (R. at 264.)  Montaldo was able to change for the exam on his own, needed no help getting on or off the exam table, and was able to rise from a chair without difficulty.  (*Id.*)  She observed that he had full movement in the cervical spine, that there were no abnormalities in the thoracic spine, and that the lumbar spine showed flexion of "90 degrees" and "full lateral flexion and rotation."  (R. at 265.)  Montaldo also had a full range of motion in the shoulders, elbows, forearms, wrists, hips, knees, and ankles.  (*Id.*) She assessed his strength as "5/5" in both the upper and lower extremities.  (*Id.*)  She also rated his grip strength as "5/5" and observed that his hand and finger dexterity were intact.  (R. at 266.)  Based on these observations, she also concluded that there were "no limitations with the upper extremities for fine or gross motor activity," with "standing or sitting," or with "personal grooming or activities of daily living."  (R. at 266.)  She did, however, conclude that he had "mild limitations walking distances and climbing stairs due to fatigue."  (*Id.*)

On March 19, 2007, Donatelli completed a non-examining "Physical Residual Functional Capacity Assessment" of Montaldo for the SSA.  (R. at 290-95.)  This assessment was based on all the information in Montaldo's file, including his clinical and laboratory findings, symptoms, observations, lay evidence, and reports of daily activities. (*See* R. at 290.)  Donatelli concluded that Montaldo could occasionally lift twenty-five

pounds.  (R. at 291.)  Donatelli determined that Montaldo was able to "frequently lift and/or carry" ten lbs; "stand and/or walk" for "at least 2 hours in an 8 hour work day; sit for "about 6 hours in a 8 hour work day," and that he had an "unlimited" ability to "push and/or pull," within the constraints of his ability to "lift and/or carry." (*Id.*)  Donatelli found that no postural limitations had been established, including climbing, balancing, stooping, kneeling, crouching, or crawling.  (R. at 292.)  Donatelli also found that no manipulative limitations had been established, including reaching in all directions, handling (gross manipulation), fingering (fine manipulation), or feeling.  (*Id.*)  Donatelli further found no visual impairments that would "support limitations related to vision changes." (*Id.*)  Donatelli confirmed that Montaldo had slight hearing loss, but also noted that there was "no evidence of difficulty hearing while using [the] telephone or at [the consultative evaluation]."  (R. at 293.)

Donatelli concluded that Montaldo's claims of being unable to walk more than a mile without rest "could reasonably be related to a medically determinable kidney impairment," and that the "overall medical record" supported Montaldo's claim of having limitations walking more than a mile.  (R. at 293-94.)  Donatelli, however, concluded that this would not preclude Montaldo from work related activities.  (R. at 294.)  Donatelli noted that this conclusion differed from the opinion of Montaldo's treating physician, Dr. Delaney, because "the objective medical evidence" did not support Dr. Delaney's claim that Montaldo was "limited in standing/walking more than 2/8 hrs." (*Id.*)  Donatelli believed that the objective medical evidence supported some limitations related to fatigue, but did not "support limitations in standing/walking less than 4/8 hrs." (*Id.*)

### iii.      Evidence after the period at issue

On April 12, 2009, Montaldo was admitted to Montefiore Hospital after waking with chest pain that radiated to his shoulders and back.  (R. at 355, 533-34.)  He was diagnosed with an aortic aneurysm, unstable angina, and neck rediculopathy.  (R. at 560.)

A cardiac catheterization, ventriculogram, and coronary angiogram revealed "[o]ne vessel(mild, branch) coronary artery disease," and "[m]oderate aortic valve stenosis with compensated hemodynamics at rest."  (R. at 655.)  On April 27, 2009, Montaldo was discharged with the following diagnoses: paroxysmal atrial fibrillation; hypertension; moderate aortic stenosis; aortic aneurysm; gout; and Alport's syndrome.  (R. at 508.)

## II.  DISCUSSION

### A.  Standard of review

The Court's review of the Commissioner's decision is limited.  *See Vieno v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  A court only sets aside the Commissioner's decision when it is based on legal error or is not supported by substantial evidence in the record.  *Acierno v. Barnhart*, 475 F.3d 77, 80-81 (2d Cir. 2007); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).  Furthermore, "[t]he findings of the commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  "Substantial evidence" is "defined as 'more than a mere scintilla.'  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rosa*, 168 F.3d at 77 (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).  "The substantial evidence test applies not only to findings of basic evidentiary facts but also to inferences and conclusions drawn from such facts."  *Marrero v. Apfel*, 87 F. Supp. 2d 340, 345 (S.D.N.Y. 2000) (citation omitted).

To determine whether substantial evidence supports the Commissioner's decision, "the Court carefully considers the whole record, examining evidence from both sides."  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citing *Quinones v. Carter*, 117 F.3d 29, 33 (2d Cir. 1997)).  However, the Court cannot weigh medical evidence because conflicts of medical evidence are resolved by the Commissioner.  *Veino*, 312 F.2d at 588.  The Court "must be careful not to 'substitute its own judgment for that of the

[Commissioner], even if it might justifiably have reached a different result upon de novo review.'" *Meija v. Astrue*, 719 F. Supp. 2d 328, 335 (S.D.N.Y. 2010) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (additional quotation and citation omitted)); see also 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").  However, the Court will not defer to the Commissioner's decision if it is the "product of legal error." *Meija*, 719 F. Supp. 2d at 335 (quotations and citations omitted).

   B.   <u>"Disability" for the purposes of disability benefits</u>

   A claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1) (2006).

   The Commissioner has established a five-step sequential analysis to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520 (2011).  The United States Court of Appeals for the Second Circuit has articulated that analysis as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also Barnhart v. Thomas,* 540 U.S. 20, 24-25 (2003). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do; [the Commissioner] need not provide additional evidence of the claimant's residual functional capacity." *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

In assessing disability, an ALJ must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir. 1983)).

C.   <u>The ALJ's application of the five-step sequence to Montaldo's claim</u>[6]

In his written decision, the ALJ followed the five-step sequential analysis to determine whether Montaldo was disabled and eligible for SSI and DIB.

First, the ALJ concluded that Montaldo had not engaged in substantial gainful activity from December 22, 2006 until November 1, 2008.  (R. at 20.)  He noted that Montaldo had worked  part-time during the closed period, but concluded that this work was insufficient to be substantial gainful activity.  (*Id.*)

Second, the ALJ determined that Montaldo had three "severe impairments:" kidney disease, Alport's syndrome, and hearing loss.  (R. at 21.)  In the second step, the ALJ also determined that Montaldo's depression was not a "severe impairment."  (*Id.*)  The ALJ considered the four functional areas for evaluating mental disorders: "daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  (*Id.*); 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  The ALJ concluded that Montaldo had

---

[6] Although the ALJ's decision became the final decision of the Commissioner, the ALJ performed the actual analysis under review. Therefore, the remaining discussion will refer to the ALJ's findings.

"no more than 'mild' limitation" in each of the first three functional areas because of Montaldo's statements in his applications; his lack of difficulty focusing on his daily activities and part-time work; and the medical records of both his treating mental-health caregivers and his consultative examiner, Dr. Herb Meadow.  (*See* R. at 21.)  The ALJ also found that there were "no episodes of decompensation which have been of extended duration."  (*Id.*)  Based on these findings, the ALJ concluded that Montaldo's mental limitation was "nonsevere."  (*Id.*); *see also* 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe . . . .").

In the third step of the disability analysis, the ALJ concluded that Montaldo did not have an impairment or combination of impairments that met or medically exceeded those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  (R. at 22.)

In the fourth step, the ALJ first determined that Montaldo had the "residual functional capacity to perform at least the full range of light work."[7]  (R. at 22-23.)  The ALJ then concluded that Montaldo was able to perform his prior work as a wine store sales representative during the closed time period.  (R. at 24.)  The ALJ also concluded that Montaldo would have been able to perform his then current work as a telecommunications sales representative during the closed time period.  (*Id.*)  Finally, the ALJ determined that as of November 1, 2008, Montaldo was "not disabled" because his full-time work constituted substantial gainful activity.  (*Id.*)

In reaching this conclusion, the ALJ considered and partially discredited Montaldo's statements regarding the intensity, persistence, and limiting effects of his symptoms.  (R.

---

[7] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, one must have the ability to do substantially all of these activities.  20 C.F.R. §§ 404.1567(b), 416.967(b).

at 22.)  Particularly, the ALJ found that Montaldo's claims of fatigue were inconsistent with his daily living activities and his performance of both part-time and full-time work. (*Id.*)  He also credited Dr. Revan's Feb. 2007 medical opinion that Montaldo's fatigue only caused mild limitations walking distances or climbing stairs because it was based on a "complete physical examination."  (R. at 23.)

The ALJ also did not fully credit the functional assessments provided by Montaldo's treating nephrologist, Dr. Delaney.  (*Id.*)  In January 2007, Dr. Delaney completed the Attorney Questionnaire and opined that Montaldo could only do sedentary work and that he could only lift 10 pounds, occasionally.  (*Id.*)  The ALJ noted that her report was only supported by a finding of fatigue, without other objective findings. (*Id.*).  He also noted that her findings were inconsistent with her other functional assessment report, the SSA Questionnaire.  (*Id.*)  Finally, the ALJ noted that Dr. Delaney had informed him, in a letter, that she was "not qualified to assess Montaldo's functional capacity, or his occupational abilities."  (*Id.*)  For these reason, and Montaldo's repeated ability to perform work, he found her opinions "less persuasive" and gave them "less than significant weight."  (*Id.*)

Montaldo does not dispute the ALJ's determinations in the first and the third steps of the disability analysis.  He does, however, contend that the ALJ erred by finding that his depression was a non-severe impairment in the second step of the analysis.  Montaldo contends that there is substantial evidence that shows that his depression caused more than minimal functional limitations and that the ALJ did not consider this evidence when making his determination.

Montaldo also raises four arguments attacking the validity of the ALJ's decision-making process in the fourth step of the disability analysis: 1) the ALJ did not give the proper weight to the opinions of his treating physicians and improperly gave controlling weight to a consultative examiner; 2) the ALJ did not adequately develop the record; 3) the ALJ did not perform the required function-by-function analysis to determine

Montaldo's residual functional capacity assessment; and 4) the ALJ did not apply the correct legal standard when evaluating Montaldo's credibility. Montaldo argues that because of these errors the ALJ's determination was not supported by substantial evidence and requests a remand to properly assess his disability.

D. Substantial evidence supports the commissioner's determination that Montaldo's depression was not a severe impairment

Montaldo contends that the ALJ's determination that his depression was not disabling was in error. He points to his regular treatment for depression, two weeks of outpatient therapy in the summer of 2005, his thoughts of dying, and several Global Assessment of Functioning ("GAF") scores of 45 or 50.

Despite Montaldo's contentions, the Record contains "relevant evidence that a reasonable mind [would] accept as adequate to support" the ALJ's determination that Montaldo did not have a severe mental impairment. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). The ALJ's evaluation of the functional areas relied on four factors: medical records provided by Montaldo's psychologists, therapists, and consultative examiners; his repeated ability to perform daily activities and engage in part-time work; his ability to start a full time job; and his own testimony. (R. at 21.)

Substantial evidence from Montaldo's medical records supports the ALJ's determination that Montaldo had "no more than 'mild' limitation in the areas of daily living; social functioning; and concentration, persistence, or pace; and no "episodes of decompensation which have been of extended duration." (R. at 21.) Montaldo's treating therapists and psychologist repeatedly indicated that he was "able to live independently," "travel independently," was in "good physical condition," and had "good cognitive functioning (R. at 214, 386.) They also reported that he had a "significant support system." (R. at 214.) The ALJ's finding was also corroborated by diagnoses from Montaldo's treating and consultative psychologists, who assigned him GAF scores of 75 in February 2007 (R. at 206), May 2007 (R. at 492), August 2007 (R. at 490), and

September 2007 (R. at 502), indicating "no more than slight impairments in social, occupational, or school functioning," DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Am. Psych. Assoc. ed., 4th ed. 2000).

Montaldo's work history during and after the closed period also supports the ALJ's analysis of the four functional areas.  Montaldo received his certification as a dog groomer (R. at 136, 137) and worked two days per week selling wine on commission for seven months (R. at 33, 161).  He was also able to work twelve-hour days as a taxi driver. (R. at 163.)  Furthermore, at the end of the closed period, Montaldo was able to resume full time employment at Cablevision.  (R. at 36, 41.)

In addition, Montaldo's own testimony and statements indicated that he had "little to no mental limitation."  (*See* R. at 21.)  During his hearing, Montaldo testified that he left this job at Testa due to insufficient income, not because of a disability.  (R. at 34.) Additionally, Montaldo testified that he was able to maintain a support circle during his depression.  (R. at 40.)  Montaldo also indicated to his therapist that he socialized with friends (R. at 243) and had been dating after his separation (R. at 247).   In addition, Montaldo wrote in his disability application that he was capable of such daily living activities as cooking, cleaning, shopping, laundry, and self-care.  (R. at 22.)

The evidence cited above demonstrates that there was substantial evidence to support the ALJ's determination that Montaldo did not have a severe mental impairment.

E.   Residual function analysis

Montaldo contends that the ALJ's made four errors of law in the fourth step of the disability analysis: 1) the ALJ did not give the proper weight to the opinions of his treating physicians and improperly gave controlling weight to a consultative examiner; 2) the ALJ did not adequately develop the record; 3) the ALJ did not perform the required function-by-function analysis to determine Montaldo's RFC; and 4) the ALJ did not apply the correct legal standard when evaluating Montaldo's credibility.  Because of these

errors, Montaldo argues that the ALJ's RFC determination was not supported by substantial evidence and requests a remand to properly assess his disability.  None of these arguments has merit.

> 1. *The ALJ's decision not to give Dr. Delaney's Multiple Impairment Questionnaires "controlling weight" did not constitute legal error*

The "medical opinion" of a claimant's "treating source" is given "controlling weight" in the ALJ's analysis of the "nature and severity" of a claimant's impairment if the medical opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); *see Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (stating that the ALJ is not required to award controlling weight to opinions of treating sources that "are not consistent with other substantial evidence in the record such as the opinions of other medical experts").  The opinion of a consulting physician may constitute the substantial evidence to rebut a treating physician's opinion.  *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983).  In fact, even the opinions of non-examining sources, when supported by sufficient medical evidence in the record, can override the opinion of treating sources and be given significant weight.  *See, e.g.*, *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993)).

If there are genuine conflicts in the medical record, it is the ALJ's role to resolve them.  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).  When the treating source's opinion is not given controlling weight, the ALJ must put forth "good reasons" explaining his decision.  *Halloran*, 362 F.3d at 32-33.  The ALJ, however, need not explicitly reconcile every shred of conflicting medical testimony.  *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983); *Melendez v. Astrue*, 630 F. Supp. 2d 308, 316 (S.D.N.Y. 2009) (citation omitted).  The ALJ should consider the following factors to determine how much weight to accord a treating physician's opinion: (i) the frequency of examination

23

and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Halloran,* 362 F.3d at 32.  It is however, the ALJ who makes the "ultimate finding" about whether a claimant is disabled.  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

When the ALJ evaluated Montaldo's residual functional capacity, he considered the two reports from Montaldo's treating nephrologist, Dr. Delaney.  (R. at 23.)  In the SSA Questionnaire, Dr. Delaney indicated that Montaldo's fatigue did not limit his physical activity and that he could "frequently" lift up to "25 lbs."  (R. at 274.)  In the Attorney Questionnaire, Dr. Delaney indicated that Montaldo could only "stand/walk" for 3 hours "in an eight-hour day," and that he could "frequently" lift and carry "5 – 10 lbs." (R. at 408-09.)  Neither questionnaire, however, included any objective clinical findings.  (*See* R. at 272-76, 406-13.)  Nor did Dr. Delaney examine Montaldo in the month before completing either questionnaire.

The ALJ ultimately assigned "less than significant weight" to Dr. Delaney's questionnaire responses.  (R. at 23).  The ALJ acknowledged that Dr. Delaney was the treating physician, but he noted that the Attorney Questionnaire did not contain "objective signs or findings, other than fatigue, that might correlate with such limitations."  (*Id.* & n.4).  He observed that not only were Dr. Delaney's findings inconsistent with Dr. Revan's clinical analysis, but that they also conflicted with her own evaluations and with Montaldo's day-to-day activities.  (R. at 23.)  Finally, the ALJ credited Dr. Delaney's own statement that she was "not qualified to assess Montaldo's functional capacity, or in a position to judge his occupational abilities."  (*Id.*)  Therefore, the ALJ provided "good reasons" for not giving Dr. Delaney's opinion controlling weight. *See Halloran*, 362 F.3d at 28.

### 2. *The ALJ fulfilled his duty to develop the record*

Montaldo argues that the ALJ did not adequately develop the record because he failed to obtain opinion evidence from Montaldo's psychiatrist, Dr. Koppes, and therapist, Jessica Kemp, regarding the impact of his depression and anger management issues on his ability to work.

When evaluating whether the Commissioner's findings are supported by substantial evidence, the district court must engage in a preliminary review to ensure that the "claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'" *Echevarria v. Sec'y of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Sec'y of Health, Educ. & Welfare,* 463 F.2d 38, 43 (2d Cir. 1972)). Specifically, "it is the rule in [the Second Circuit] that 'the ALJ, unlike a judge in a trial must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,' even if the claimant is represented by counsel." *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996)). The SSA shall make "every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d). However, an ALJ is not required to obtain retrospective medical assessments when he has considered the doctors' available records, and the claimant has not indicated that the retrospective assessments would reveal "any useful information or that the physicians were prepared to undertake such assessments." *See Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996).

The ALJ amply fulfilled his duty to develop the record. The transcript shows the ALJ questioned Montaldo extensively about his mental health. (R. 40-44.) Montaldo took the opportunity to discuss the effects of his medication on his depression. (R. at 42.) The record included the medical records of three treating psychiatrists, Dr. Koppes (R. at 205-06, 208-216, 219-220, 416-419, 490-93), Dr. Aparna Pemmaraju (R. at 488-89, 502), and Dr. Katz (R. at 486-87), and three treating therapists, Kemp (R. at 205-06, 214-16,

235-50, 337, 339-46, 416-19, 426, 433, 498-501), Keeler (R. at 233-34, 306-08, 358-60, 490-93), and Morales (R. at 386-89, 481-85, 487-89).  Therefore, the record contained the medical records of both individuals that Montaldo says the ALJ overlooked.  Moreover, the ALJ gave Montaldo's attorney the opportunity to request the inclusion of additional medical records, but the attorney stated that he was satisfied with the record.  (R. at 44.) The ALJ gave the reports of Kemp and Dr. Koppes "careful consideration" (*see* R. at 20), was presented with no reason to request additional reports.  Therefore, the court cannot conclude that the ALJ neglected his duty to develop the record because he did not, on his own motion, request additional retrospective reports from Kemp and Dr. Koppes.

3.   *The ALJ's decision incorporated the required function-by-function analysis in the residual functional capacity assessment*

Montaldo contends that the ALJ's residual functional capacity assessment did not contain the function-by-function assessment of his physical abilities required by Social Security Ruling ("SSR") 96-8p.  SSR 96-8p requires that the ALJ assess an "individual's functional limitations . . . on a function-by-function basis . . . ."  SSR 96-8p.  For this analysis, the ALJ is required to ascertain the claimant's "exertional capacity," including his ability to sit, stand, walk, lift, carry, push, and pull.  SSR 96-8p; s*ee also* 20 C.F.R. §§ 404.1545(b), 416.945(b).  Montaldo contends that the ALJ skipped this assessment and only made the conclusory assessment that he "retains the residual functional capacity for at least a full range of light work."  (Pl. Mem. Law 18-19.)  A review of the ALJ's decision, however, shows that it incorporated the required function-by-function analyses.

In his decision, the ALJ "adopted with significant weight," the report of Dr. Revan. (R. at 24.)  Dr. Revan performed a clinical examination of Montaldo and found that his gait and stance were normal; that he could walk on his heels and toes without difficulty; that he could squat fully and rise from a chair without difficulty.  (R. at 264.)  She found that he also had mild limitations walking due to his fatigue.  While she did not separately assess his ability to lift, carry, or push, she concluded that he had "no limitations with

[his] upper extremities for either fine or gross motor activity." (R. at 266.) Dr. Revan's conclusion was supported by a musculoskeletal examination in which she found that Montaldo had "full [range of motion]" in his "shoulders, knees, forearms, . . .wrists, . . . hips, knees, and ankles bilaterally," and rated his strength as "5/5" in his "upper and lower extremities." (R. at 265.) Therefore, Dr. Revan's report provided a clinical assessment of each of the SSR 96-8p's "exertional" function-by-function factors.

The ALJ also adopted the finding of the "Physical Residual Functional Capacity Assessment" that was conducted by Donatelli. (R. at 24.) This report stated that Montaldo could "occas[ionally]" lift twenty-five pounds and "frequently" lift ten pounds. (R. at 291.) Donatelli also determined that Montaldo was able to "frequently lift and/or carry" ten lbs; "stand and/or walk" for "at least 2 hours in an 8 hour work day; sit for "about 6 hours in a 8 hour work day," and that he had an "unlimited" ability to "push and/or pull," within the constraints of his ability to "lift and/or carry." (*Id.*) It also stated that no limitations had been established for Montaldo's ability to climb, balance, stoop, kneel, crouch, or crawl. Donatelli also found that no manipulative limitations had been established, including reaching in all directions, handling (gross manipulation), fingering (fine manipulation), or feeling. (R. at 292.) Donatelli's report, therefore, explicitly addressed each of the factors in the SSR function-by-function analysis.

These findings demonstrate that the ALJ's decision incorporated the required function-by-function analysis and that his residual functional capacity assessment was not the product of legal error.

### 4.   *The ALJ's credibility assessment of Montaldo's testimony was not the product of legal error*

Montaldo contends that he was "entitled to substantial credibility" because of his "good work record." (Pl. Mem. Law 23.) To support this contention, he cites the recent Second Circuit decision *Horan v. Astrue*, at follows: "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of

a disability."  350 F. App'x 483, 485 (2d Cir. 2009) (unpublished) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) (citing *Singletary v. Sec'y of Health, Educ. & Welfare*, 623 F.2d 217, 219 (2d Cir. 1980) ("[A] life history of hard labor performed under demanding conditions over long hours. . . . justifies the inference that when [a claimant] stopped working he did so for the reasons testified to.")).

        This is an incomplete summary of the law.  The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)).  A petitioner's work history "is just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony." *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998).  It is the ALJ who must "resolve evidentiary conflicts and . . . appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y, Dep't of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  Therefore, the ALJ's determination, including the rejection of the claimant's testimony, must be upheld, "[i]f the [ALJ's] findings are supported by substantial evidence."  *Aponte v. Sec'y, Dep't of Health & Human Servs.of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

        Rather than stating categorical rules, both *Horan* and *Rivera* assume the claimant is credible unless that assumption is rebutted by substantial evidence.  For example, in *Horan*, the presumption of substantial credibility applied because a conflict between the claimant's testimony and the medical evidence only existed because the ALJ misstated the claimant's testimony.  *Horan*, 350 F. App'x at 484.  Likewise, in *Rivera*, the ALJ made an improper adverse credibility determination when he relied solely on his own observations of the claimant's pain at the disability hearing, even though substantial evidence did not support his finding.  717 F.2d 719, 724 (2d Cir. 1983).

In contrast, Montaldo was not entitled to a presumption of substantial credibility because substantial evidence conflicted with his statements.  In his application, Montaldo stated that he suffered from constant fatigue and that he needed to sleep for an hour and a half each afternoon.  (R. at 116).  Substantial evidence in the Record, however, conflicts with Montaldo's statement.  Montaldo was able to able to work twelve hour shifts driving a taxi during the closed period (R. at 163), and he spent full days training at a dog grooming school (R. at 37).  In addition, the medical opinions of both his treating physician and consultative examiners contradicted his claims of fatigue-related limitations.  Dr. Delaney wrote in her reports that Montaldo did not have "any limitation of physical activity as demonstrated by fatigue" (R. at 409), and that he would not have to take "unscheduled breaks to rest . . . during an 8-hour work day." (R. at 411).  Dr. Revan also concluded that Montaldo had no limitations on activities of daily living and that he only had a mild limitation walking distances or climbing stairs, due to his fatigue.  (R. at 266).  Because the record contains substantial evidence that contradicts Montaldo's statement regarding the effects of his fatigue, the ALJ was entitled to not give his testimony substantial credibility.

   5.   *The ALJ's residual functional capacity assessment was supported by substantial evidence*

After reviewing the Record, the Court finds that the ALJ's residual functional capacity assessment was supported by substantial evidence.  Evidence, including the testimony, medical records, and medical opinions examined above supported the ALJ's determination that Montaldo was in fact capable of performing the full range of light work.  Dr. Revan concluded, after performing a clinical examination, that Montaldo had "no limitations with the upper extremities for fine or gross motor activity," with "standing or sitting," or with "personal grooming or activities of daily living."  (R. at 266.)  She also found that he only had "mild limitations walking distances or climbing stairs due to fatigue." (R. at 266.)  Likewise, non-examining consultant Donatelli concluded that

Montaldo could occasionally lift "25 lbs" and frequently lift "5-10 lbs." (R. at 291). Montaldo was also able to work full days as both a taxi driver (R. at 163) and as a trainee at dog-grooming school during the closed time period (R. at 36-37). In addition, Montaldo was able to work full-time as a sales representative from the end of the closed time period until the ALJ's hearing. (R. at 35-36.) Because a "reasonable mind" could conclude that this evidence is "adequate to support" the ALJ's residual functional capacity assessment, his determination is supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

## III. CONCLUSION

Because the Commissioner's decision was supported by substantial evidence and not based on legal error, the defendant's motion for judgment on the pleadings is granted and Montaldo's cross motion for judgment on the pleadings is denied. The final determination of the Commissioner is affirmed.

Dated: New York, New York
        March 15, 2012

SO ORDERED:

Sidney H. Stein, U.S.D.J.

30